This morning we have six cases before the panel, three of which will be orally argued. Three have been submitted on record. For purposes of the record, the three submitted cases are 20107055, Jerry v. DDA. The second one is 20103060, Phillips v. Air Force. And 201071381 v. DDA. The first argument will be on case number 20105032, FIRST ANNAPOLIS BANCORP v. United States. Mr. Dinser, are you ready? Yes, Your Honor. Thank you. May it please the Court. The plaintiff asks the Court to assemble an implied-in-fact contract out of the transaction documents regarding a goodwill promise, but then seeks to avoid complying with the terms of that very same alleged contract. The Court should hold that the plaintiff can't have it both ways. Turning to the question, first, of privity, the plaintiff was not in privity with the United States. Let me ask you, aside from the question of whether or not Bancorp was in existence for the initial two-week period, is there any difference between this case and home savings aside from that issue? Yes, Your Honor. There are fundamental differences. The first of which is, in home savings, this Court held that the holding company, the plaintiff, participated in all aspects of creating the deal. And I'll quote this Court. Amundsen, that's the holding company, negotiated for approval of homes acquisitions. They were there. They were negotiating the terms. In this case, the holding company not only didn't exist when the initial documents went in, when the initial terms went in, but they didn't participate in any negotiation. I will quote the plaintiff. They admit this. Quote, it is undisputed that the contract documents acknowledged at the time of negotiation and formation that Bancorp was not yet but would be incorporated. I'm sorry, Your Honor. What are you quoting? I'm quoting the plaintiff's brief at page 19. So it is undisputed. They weren't there. They weren't at the table. What home found was that... Well, they may have not been physically at the table, but that was the elephant in the room, was it not? I mean, this deal was going down or not going down based on the existence of Bancorp and what the expectations were that Bancorp would be doing. No, Your Honor. In cases like Carolyn Hunt and Home, where you had a pre-existing holding company with a lot of money and they were controlling, and Carolyn Hunt, they said, we're the principal, then you knew that was the elephant in the room. Bancorp was created by the thrift solely as a shell corporation to make the acquisition. They were created for tax purposes. There were other conversions of this sort, such as Levan. But you needed their infusion of the money. This whole deal was going to rise or fall based on the infusion of the money. You needed someone's infusion of the money. The shareholders could have done it directly, and this Court has repeatedly held that the simple infusion of the money, bringing money to the table, that alone in the Cain case repeatedly has held that that alone can't be enough to demonstrate the existence of an implied in fact contract. Wait, wait, wait. The First Annapolis promised to raise the money in return for the forbearances, right? The thrift, yes, Your Honor. Right. So in that sense, it wouldn't be a stretch to find an implied in fact contract between the thrift and the board to raise the money, correct? That is correct. So getting back to Judge Prost's initial question, the key here is that Bancorp wasn't part of that negotiation. Precisely. If it had been part of that negotiation, then you'd have a very difficult case. It would fall into those set of cases where the Court has looked at negotiation, the bringing of the deal together, the signing off of the deal, sort of the big elephant, the big brother in the room making the deal. But this is not that case. The thrift is not here as a plaintiff. The only plaintiff is Bancorp, and they didn't exist. In Levin, this Court made clear, an implied in fact contract is founded upon a meeting of the minds, which although not embodied in an express contract, is inferred as a fact from the conduct of the parties. Well, if they didn't exist when the primary documents went in and they didn't participate in the negotiations and they were basically a shell, there's no conduct to infer or imply a contract regarding goodwill that contained, you know, with the government. In spite of the fact that there was an indication that they were going to set up a holding company? Well, Your Honor, all that shows is who was pulling the strings. This is not a holding company setting up a thrift to make the acquisition. The thrift was pulling the strings. The thrift passed a resolution to create the holding company. The thrift filed the documents. The thrift negotiated. The trial court actually found, and I'm quoting the trial court, first federal, that's the thrift, and the regulators entered into negotiations which ultimately led to the conversion of first federal. So the thrift, but the holding company was absent. So based on that, the Court should find that the holding company did not have privity of contract with the United States regarding a goodwill promise. I have a question. If Bancorp hadn't funded First Annapolis, the deal would have gone down. Well, Your Honor, if no one had funded First Annapolis, the deal certainly would have gone down, but that's true. But it didn't have to be Bancorp because Bancorp was just a shell. They didn't have any money at all before they raised it. There could have been second Bancorp. There could have been someone else. Ultimately, the shareholders came in. There didn't have to even be a holding company, and that's why for the Court to find that Bancorp itself was an essential party is fundamentally different than Amundsen and the Caroline Hunt Trust in those cases where they were the only party who owned the thrift. But First Federal stockholders could have funded it directly. They could have, and that's what happened in Levin. And so it was not an essential party. Bancorp was not an essential party. But they did ultimately enter into an agreement, Bancorp did, to put in additional capital into the Thrift, and in response to that, you can argue that they got the forbearances, right? No, Your Honor. I mean, half no, Your Honor, respectfully. They did, in fact, enter into the RCMDA, which we don't deny was an agreement, a contract, but that did not incorporate or reference the forbearances. So as the Court held in SoCal, the signing of the RCMDA is not evidence of a goodwill contract. It is merely the evidence of an agreement regarding the RCMDA. And here they're not sued. How did they get in return for the signing of the RCMDA? The government ultimately approved the deal. But that doesn't give— No, but it wouldn't be a stretch, would it? I mean, if we were dealing here with additional contributions, it wouldn't be a stretch to say that they agreed to make the additional contributions in exchange for the forbearances. Well, Your Honor, respectfully, I think it would be. This Court held specifically against that in SoCal, when this Court said that even when you sign an RCMDA, unless you're suing on the RCMDA, if we had forced them to make some sort of payments, then— Well, that's what I'm saying. Oh, I misunderstood the question, Your Honor. What I'm saying is that if they put in additional contributions pursuant to the RCMDA, they would have a pretty good argument that taking away the forbearances was a breach of the RCMDA and that they might be able to get those additional contributions back. Well, they might, Your Honor, if the RCMDA didn't also have a term, an expressed term, that said that the plaintiffs accepted the risk of regulatory change. Well, I'm putting aside that argument. Okay. They would still have a better argument. I will grant the Court. They would have a better argument if they had acted on or been required to act on the RCMDA, which they never did. The RCMDA did have a term that said expressly that the plaintiffs assumed the risk of regulatory change. And that term, the things that are agreed upon is they signed the agreement that it has that term. This Court has repeatedly found that that term means that if FIREA and the changing regulations was a burden for the plaintiff and not the government, and this Court has repeatedly held that that applies to the forbearance or any forbearances that might exist, so that changing the forbearances or eliminating them, the plaintiffs assume that risk. And, in fact, it's quite explicit in the RCMDA that that term might cause their financial risk to go up. Now, the only question, the only thing in debate, is whether there's an exception provided in the RCMDA for the forbearance. The language of the plaintiffs, what they say creates the exception, is on page 40 of our brief. But, basically, there's no mention of the forbearance, there's no exception language, and in comparison to the one case where this Court has found an exception, the Hometown case, the Court should look at this language and see that the government never intended and the plaintiffs never intended to protect the forbearance. I was going to move to another area, just on the damages question. Yes. Did you, because I don't think you responded to the Red Group's complaint that this issue wasn't raised before the Court of Federal Claims, did you, in fact, raise requests that the Court of Claims reduce the amount of damages, the amount equal to the improper loans? We did not expressly do that, Your Honor, no. So wasn't that issue weighed? Your Honor, we believe in fairness to avoid a windfall that the Court would have to apply that set-off, but it was not raised below, fairly. What are the actual damages that they're asking for? They're seeking the entire contribution, the Bank Court's entire contribution, including the improper shareholder loans, and they were awarded that. The Court should conclude that even if the RCMDA didn't place the risk of regulatory change on the plaintiffs, that they prior materially breached the agreement, the alleged agreement as they describe it, the Court found, and they don't deny, that they did breach it. The only question is whether that breach was material. And as this Court has held, a misstatement or false statement to the government is material if it allows the deal to go through, if it causes the government to act or approve in such a way. The Court said this in Christopher Village and said it again in Long Island. No, but those were fraud situations. Fraud situations. The misconduct was fraud, but the reason that this Court found materiality was because it allowed the government or caused the government, the misstatement, to stamp something and say, go for it. Yeah, but under Christopher Village, that any fraud is material. So to come under that, and we have to show that there was fraud here, it seems difficult to show that there was fraud. Well, we didn't... You're not even claiming there was fraud. We are not claiming fraud, Your Honor. So putting aside the fact that all fraud is material, what we do have here is statements from the regulators saying we would not have approved this deal, would not have gone forward had they not made the misstatements, the false statements to the government. And in Christopher Village, this Court said the test of the materiality of a statement is whether a statement has a natural tendency to influence or is capable of influencing the decision of the tribunal. It did because it caused that statement. Everything that we've done is in compliance with the law and with the conversion plan was false, and it caused the government to stamp it approved. So we'd ask the Court... When you hear those, you have a regulatory violation. We have a regulatory violation, but then we have a statement in the RCMDA that says that everything that they've given to the government is accurate and reliable, and they told the government that they complied with their conversion plan. So those are the misstatements that caused the government to stamp this thing approved. Would you like to say something, Your Honor? I would. Thank you, Your Honor. Court's indulgence. Good morning. The government raises four distinct issues on appeal. The first... The last three of the four have to do with factual findings of the Court below. They're all fact findings. They're all fact-bound. And I call the Court's attention generally, and I know I don't have to, to the deferential review of fact finding. But having said that, to go to the first point, the issue is one of standing. If we look at the cases, which I suspect is a legal determination, if we look at the cases, there are two lines of cases. Our main case was home savings, which is what the Court found was most analogous. If you look at all the cases together, what they seem to say... Not they don't seem to say, they do say, is that when an entity like Bancorp is an integral part of an integral transaction, it has standing. I'm sorry? They're not dealing with a situation where the holding company didn't exist. So far as I can tell, this is the first time we've had that issue. So you each like to say that these cases govern, those cases govern, but we haven't had a case like this before, where the holding company didn't exist at the time of the negotiations. Well, there are two answers, two or three answers to that. The first is that as of the time of the contract, it did exist well before the time of the contract. The contract being the RCMDA? The consummation of the conversion to include the RCMMA. It existed months before that. The RCMDA doesn't include any promise about injecting capital, right? The RCMDA requires the maintenance of capital. Right, but not the initial infusion, right? I agree with that, but if you look at all of the deal documents, every deal document, to include all the resolutions, to include all the applications, to include all the approvals, they all make reference to the acquisition by Bancorp, an entity initially, to be sure, an entity to be formed, but it was formed as part of the overall transaction, and frankly, by the time the overall transaction happened, it had been in existence for months as it had always been contemplated to be. The other issue is even if you... I'm sorry? When was the contract formed? It ultimately happened in August of 88, as I recall it. What's that, the RCMDA? I'm not certain on the executed signature on the MDA. That was when the overall transaction that resulted in the infusion of the capital, the conversion to a stock, the infusion of the capital, and the acquisition by Bancorp was finally approved. By that time, Bancorp had been in existence for a long time, and of course it was only then. I guess I'm trying to figure out when did the contract take place? In our view, August of 88, when the transaction was finally approved by the government, and all of the things that were contemplated happened. That is, that the bank had the forbearances, and the capital flowed, and by that time, Bancorp existed. You know, the other frailty was this... At that point, bind the actions of the holding company if it was not in existence. Could the... First Federal was a threat. I think that... Could their actions bind the holding company if the holding company did not exist at the time that the agreement was... As a technical proposition, the answer, if I get too legalistic, is probably no, but... Well, let's be legalistic. No, but having said that, there are numbers of cases, we don't see them in a WinStar context all that much, but we see them a lot having to do with the statements of promoters, that if you assume that the people who were putting this deal together to include the contemplated creation of Bancorp were promoters, there's no question that the assent by the government to these promoters would be sufficient to protect the ultimate creation of Bancorp, and the rights would flow to Bancorp. And I really... The other issue, by the way, is that this notion that Bancorp hadn't been created, that was never argued to the court below. The first time we heard that was in the government's brief. And so what they now say is this significant issue. I suggest you shouldn't even be in the case because it wasn't argued. I must say I was surprised when I saw it because I knew... Is it your view that there's just no... I'm sorry? Is it your view that there's just no material difference between Bancorp and First Annapolis? Sort of like a reverse piercing of the coin? I'm infirm in a number of ways this morning. I didn't hear you. I have a head fold. I'm sorry. Does your view rest on the argument that there's just no difference between First Annapolis and Bancorp? No. No, my view is... No, there's a technical difference between the bank, the newly formed bank, and the acquirer of the bank. I acknowledge that. My view is that because Bancorp was contemplated as an integral part, there would have been no reason to create Bancorp other than that which had been contemplated as part of the overall transaction that Bancorp fits into your rubric with respect to the cases of Hometown... Hometown, Franklin... No, not Hometown, excuse me. Home, Franklin, Castle. Levan. And that the case that they rely on, their primary case, is... Court's indulgence. ...is Southern Cal. Now, Southern California versus the United States. Now, in that case, what you had was essentially a situation very much like this with the exception that the shareholders of the holding company were bringing claims against the government, and everybody acknowledged that the holding company was...had standing, and in this case, of course, were not bringing claims for shareholders of Bancorp, were bringing claims for Bancorp. And so the court... the... to allow the government to seize on the fortuity, that that which everybody bargained to be created and to acquire the bank, which was everybody... that's what these folks were talking about, that at the time that they talked about it, they didn't really understand or acknowledge that Bancorp was to be created, it seems to me, is, well, unfair to be kind to it. But the problem is that there is a legal difference, as you seem to concede, between Bancorp and the thrift. And are you saying that the thrift somehow was like the promoter in these promoter cases that you cite in your reply brief? I'm trying to look at this as a practical proposition. There was one person... What's the answer to the question? Are you saying that... The people... First Federal, the thrift, is the same as the promoter in those promoter cases? The answer is officials of First Federal, Doug Parent was the primary negotiator of all of this, was the promoter of this transaction on behalf of both First Federal and Bancorp. Well, it can't have been a promoter of the transaction during the negotiation period for Bancorp, because Bancorp didn't exist, right? Right. Well, then the whole notion... If I were to follow that line, then the whole notion of promoter... of promoter... the ability of a promoter to create obligations that would bind its ultimate... its ultimate thing, in this case, Bancorp, would just go out the window. There would be no such thing as a promoter. And in this, of course, a practical matter, it all focuses on Doug Parent. Doug Parent was the person who was trying to put this transaction together, and he was an official of both First Federal and Bancorp. But all I can do is rest on your case law and suggest to you that the timing of the incorporation, in this case, because it had been accomplished by the time everything happened, by the time people... both sides, both sides... agreed to perform under this contract, it would seem to me that the fact that it didn't exist on the first day shouldn't make any difference. We rest on your case law. It says what it says. And now, if I can move on to the risk of regulatory change, that is dealt with in the language. There's a matrix, a little chart, on pages 27 and 28 of our brief. The problem with the government's argument there is twofold. The first is that it ignores the fact that unlike all of the cases where this Court has found the risk of regulatory change with the left side, there's qualifying language in this case, and that is the thereafter language that indicates that clearly we had a window for five years, which is unlike what happened in Admiral Guarantee. They didn't. That language was nowhere there. There was no qualifier to the language that said that the regulations, I mean the regulations now are after promulgated. I just don't see how in the face of that language it could be any clearer, nor is it meaningful to say that the RCMD didn't include forbearances because what the language of the document actually says is our capital is construed as set forth in the business plan, and the business plan and the approvals set forth all of those forbearances and so on. I just don't see how that could be any clearer in the face of that language. By the way, on the issue of Bancorp as Bancorp, if you look at all of the documents, each one of them refers to Bancorp as if it, everybody knew it had to be created for sure, but as if it existed. In July of 88, the simultaneous, the extract 517, it provided for the creation, well it didn't provide for the creation, it says there would be a simultaneous acquisition of First Annapolis by Bancorp. The application itself was an acquisition by Bancorp itself. That was the amended application. Court's indulgence, I want to answer that. I show it as, at extract 200, joint exhibit 86, I show it as the application, let me get the date of it, and it says applicants going to be incorporated under the state of Delaware for the purpose of acquiring, it's not as if Bancorp was silent in the transaction and filed the application. No, no, no, but at the time of the initial negotiations, which led to the agreement to give the forbearance, Bancorp didn't exist at that time. Yes. And if I understand correctly, and correct me if I'm wrong about this, my understanding is that there were, at the time of those  a variety of solutions to the injection of capital. One would be for the creation of a separate corporation, others might be the injection of capital directly into the thrift. Am I wrong about that? Well, is it, would that have been possible? I don't know because it was never contemplated to be that way. You know how, I think we're conjuring. What does the record show about what the contemplation was at the time of these initial negotiations? All of the, all, all of the record, the entirety of the record contemplated the capitalization of the new bank by Bancorp the acquirer. There is no evidence to the contrary. By way of example, there is no evidence to suggest that First Federal could have raised it. But where is the evidence that the formation of Bancorp was contemplated at the time of the initial negotiations as opposed to some other mechanism for creating capital? I think it's in the first, I don't mean to interrupt. I had a cold. I think it's in the first, I think it's in the first conversations between Perrin testifying that that's what he... Where? Where? I mean, where in the record, does the record show what the contemplation was at the time of the initial negotiations? All I can do is refer you to all of the deal documents, Judge. They all say First Annapolis. And, you know, let me focus on one other thing. To focus on when negotiations commenced, negotiations come to fruition at some point. By the time that was done, everything was done. I just don't know how this... I just don't think that the mere fact that the contemplated incorporation hadn't been accomplished given the fact that everybody contemplated it was going to be accomplished long before this transaction was done. I'm asking you to show me where it was understood that Bancorp would be created at the time of these initial negotiations. All I can do is refer you to the documents that are cited in the brief. All of the documents, if you look at them, refer to Bancorp as the acquirer of the thrift. Each and every one. There is no document that suggests there was any other possible route for the recapitalization of this bank. And, of course, again, by the time the negotiations reached fruition, that which had been contemplated had been done. There simply... And Doug Perrin certainly testified that that was always the contemplation. I'm just not... One of the reasons that I was troubled by the fact this came up in the brief is I'm not aware of any evidence to suggest anything other than that or that this notion that Bancorp hadn't been incorporated as of the time of the negotiation made any... That didn't come up down... It did not come up in the trial court. It did not. And one of those documents was a November 87 document, Extract 929, which is when there was an approval of the voluntary conversion. And all I can do is tell you I'm aware of nothing to suggest anything different ever happened below. On the issue of damages... Mr. Cooley, you're well over your time, but why don't you present one more issue and that will be it. Well, there are two issues. One has to do with prior material breach. Her findings are... Her finding is one of materiality. By the way, there was no actual fraud or wrongdoing here. This is very unlike Long Island where apparently the principal in that case was engaged in kickback activity that resulted in criminal convictions. There's no evidence Bancorp even knew about this. But there was a regulatory violation. I'm sorry? There was a regulatory violation. There was. And it was cured. And the regulators said cure it and we did. And all the money went in. And so I don't... I don't understand. And of course her fact findings are suggested. The last is damages. All that happened in connection with damages is she credited our witnesses and discredited theirs. Which is what fact finders do. Thank you very much for your time. Thank you. Mr. Spencer. If I may turn directly first to the question of the standard of review. The Pribity decision was made on summary judgment. It's de novo review, Your Honors. The RCMDA is a question of contract interpretation. So that also is a legal question, de novo review. Materiality for prior material breaches is a mixed question of fact and law. So what was the situation when the negotiations were taking place? When the negotiations were taking place what happened was they discussed with the government. They came forth with a business plan as part of that first as part of that big filing for the conversion before Bancorp was created. In that plan they have all the material issues that we ultimately see in the deal. There's no material changes after that. We have the $11 million contribution. We have the capital benchmarks. So those were set before. What does it say about who's going to make the $11 million contribution? It actually says and the Court can find this at A400253. First A400253 It says if you look at that first asterisk it says first federal will initially infuse capital of approximately 1.5 percent of liabilities.    the holding company. So their plan expressly states that and it says that first federal will initially infuse capital of approximately 1.5 percent of liabilities. It also at other place mentions and discusses the goodwill form or at least mentions goodwill. So the deal was basically outlined and discussed and created with that initial submission before the holding company was ever created. So the holding company couldn't have been part of all of this. But in the document at 220 400 224 they do refer to the holding company and that's stated November 4th which is before is that the first time they specifically referred to the holding company? That's November 4th. This was submitted as part of the plan of conversion. It refers to a holding company. There's no holding company in existence so it's not a specific holding company. There's no argument drawn that there was discussion of the possible creation of a holding company being part of this holding company. It was not a holding company. In fact there's language that says that prior to the conversion the possible holding company will not engage in any material operations. It's basically a shell. We argued that there was no implied contract and no express contract below. The court itself noted that bank corp didn't exist. It noted that it was making the holdings that it was making even though bank corp didn't exist.  didn't exist until 1988 because just a few weeks before the deal was completed because it was just a shell. It was a place holder. So before the deal was completed they not only were in existence but they had filed a second amendment. They were definitely in existence before the deal was completed and they filed an amendment saying that they now exist but they didn't participate in anything. So negotiations have been completed before they were formed? Absolutely. And they would have had to have been because they're all encompassed in the plan of conversion that existed before they were formed. And the trial court didn't hold otherwise. The trial court held, as I said, first federal and the regulators entered into negotiations which ultimately led to the conversion of first federal. And that's at 770 of the decision. Thank you, Your Honor. Thank you, Your Honor.  submitted. ?? ?? ?? ??